(March 18, 1912.)

# H. R. GARD, Respondent, v. G. W. THOMPSON et al., Appellants.

## [123 Pac. 497.]

WATER RIGHTS—OPTION TO PURCHASE—DEMURRERS—SUFFICIENCY OF EVIDENCE — PERMITS—STATE ENGINEER — IRRIGATION PROJECT— PRACTICABILITY—RIGHT TO DETERMINE—INSTRUCTIONS.

(Syllabus by the court.)

1. *Held,* that the court did not err in overruling the demurrers to the amended complaint.

2. Where G. entered into an agreement with T. B. & P., whereby he gave an option to purchase certain water rights, and it was provided that T. B. & P. should investigate the water supply and the practicability of such project, and if they should find such project practicable they would pay to G. $5,000 in cash and a paid-up water right for eighty acres of land, *held,* that said contract was an option and T. B. & P. had the absolute right to determine the sufficiency of the water supply and the practicability of the project, and that they did determine that said project was not practicable and so notified G. and thus terminated said option agreement.

3. *Held,* that the evidence is not sufficient to show that by engaging in another irrigation project T. B. & P. did thereby conclude that the G. project was practicable and became liable for the purchase price of said water rights.

4. The state engineer, by granting a subsequent water permit, cannot interfere in any manner with vested rights of former permit-holders.

5. A water right is real estate and must be conveyed as real estate, and where one has a valid water permit issued to him by the state engineer, he cannot convey the water right secured thereby by simply handing the permit to a would-be purchaser.

6. The evidence held not sufficient to support the verdict.

7. The giving of certain instructions *held* error.

8. Under said option agreement, in case T. B. & P. failed to comply with their part of the agreement a forfeiture is provided for, and this action was brought to enforce said forfeiture, and, in case a forfeiture could not be adjudged, to recover damages that the plaintiff alleged he had sustained, and not to recover the purchase price of the water rights of plaintiff.

9. Under the provisions of said option agreement, in case T. B. & P. found said project practicable and accepted said option, they agreed to pay the respondent $5,000 in cash and to deliver to him a paid-up water right for eighty acres of land. Such water right was not due, had said parties accepted the option, until the proposed irrigation system had been constructed, and as such system had not been constructed at the date of the trial, the plaintiff was not entitled, under the pleadings, to judgment for its value.

APPEAL from the District Court of the Fourth Judicial District for Elmore County. Hon. C. O. Stockslager, Judge.

Action to enforce a forfeiture and in case a forfeiture could not be had, to recover damages. Judgment for plaintiff. *Reversed.*

B. S. Crow, and J. H. Peterson, for Appellants.

An option is a unilateral agreement binding one party but not binding the other until its terms are accepted and the other party signifies his intention to be bound thereunder. (*Sizer v. Clark,* 116 Wis. 534, 93 N. W. 539; *Hopwood v. McCausland,* 120 Iowa, 218, 94 N. W. 469, 470; *Hanly v. Watterson,* 39 W. Va. 214, 19 S. E. 536; *Litz v. Goosling,* 93 Ky. 185, 19 S. W. 527, 21 L. R. A. 127; *Ide v. Leiser,* 10 Mont. 5, 24 Am. St. 17, 24 Pac. 695; *Wescott v. Mitchell,* 95 Me. 377, 50 Atl. 21.)

There is at least as much to indicate that it is an option as to indicate that it is a contract of purchase and sale. Such being the case, the contract is so indefinite that its terms cannot be enforced. It contains a patent ambiguity and is void for intrinsic indefiniteness. (4 Wigmore on Evidence, pars. 2404, 1 b, 2407.)

Under the decisions of this court a written conveyance would have been necessary to transfer the title of Gard's water rights. (*McGinness v. Stanfield,* 6 Ida. 372, 55 Pac. 1020.)

No man should be permitted to recover the purchase price for land unless he has either conveyed such land or offered to convey at the time of trial. (2 Sutherland on Damages, 3d ed., c. 13, secs. 567–577.)

Karl Paine, E. M. Wolfe, and L. B. Green, for Respondent.

Gard was not required to tender appellants a deed when he demanded payment of the amount due him in money under Exhibit "A." The appellants could not have demanded a deed until they were ready, able and willing to perform by paying the whole of the purchase price. (*Donovan v. Hanauer,* 32 Utah, 317, 90 Pac. 569.)

After the appellants had repudiated the agreement, it was useless to tender a deed, and the law did not require plaintiff to do a useless thing. (*Palmer v. Clark,* 52 Wash. 345, 100 Pac. 749; 9 Cyc. 641, 724.)

It was useless to demand a water right because the appellants had repudiated the agreement; also because that portion of the purchase price was not due. (*Blair v. Wilkerson Coal & Coke Co.,* 54 Wash. 334, 103 Pac. 18.)

Since it was impossible to say when a delivery of the water right for plaintiff's land would be due, it was necessary to fix the damages as of the date of the breach of the contract; that is, as of the date of the renunciation and repudiation of the contract, which was in February, 1910. (*Kadish v. Young,* 108 Ill. 170, 43 Am. Rep. 584.)

Under the agreement, the pleadings and the evidence, it was clearly the duty of Peterson to transfer to Gard all water rights acquired in his name and the agreement could not have been terminated in any other way. (*Caldwell v. Ruddy,* 2 Ida. 7 (1), 1 Pac. 339; *Bowman v. Ayres,* 2 Ida. 470 (431), 21 Pac. 405.)

SULLIVAN, J.—This action was commenced against defendants G. W. Thompson, L. G. Bradley, J. H. Peterson, Charles H. Hammett, King's Hill Extension Irrigation Company, Limited, a corporation, and Medbury Water Company, a corporation, on a written option given by the respondent Gard to the defendants Thompson, Bradley and Peterson, to purchase all of the water rights and water claims represented by two permits, each including twenty second-feet per minute

of time of the waters of certain creeks in Elmore county, which the respondent had procured from the state engineer.

Demurrers were filed to the amended complaint, on which this action was tried, which will be referred to hereafter as the complaint, and overruled by the court. The issues as made by the pleadings were tried by the court with a jury. However, during the trial the action was dismissed as to Hammett, the King's Hill Extension Irrigation Co. and the Medbury Water Co., and at the close of the trial the jury brought in the following verdict:

"We, the jury in the above-entitled cause find for the plaintiff and against the defendants, Thompson, Bradley and Peterson, and assess plaintiff's damages as follows:

Value of water right....................$5,200.00
Balance due plaintiff..................  4,782.50
                                        ─────────
Total......... ........ .... .....$9,982.50
With interest at 7 per cent..............  873.47
                                        ─────────
                                         $10,855.97
                                 "L. J. WEAVER,
                                       "Foreman."

A judgment was entered in accordance with the verdict and motion for a new trial was denied. The appeal is from the judgment and order denying the new trial.

The option contract on which this action is based is as follows:

## "EXHIBIT A.

"This agreement made and entered into this eighth day of February, 1909, between H. R. Gard of Boise, party of the first part, and G. W. Thompson, L. G. Bradley and J. H. Peterson, parties of the second part:

"WITNESSETH, That for and in consideration of the sum of one dollar, in hand paid, the receipt whereof is hereby acknowledged, and for other good and valuable considerations and for the efforts of the above-named second parties to organize and put into operation an irrigation system in Elmore county, Idaho, in which said Gard is an interested

party, the said party of the first part hereby give and grant to the said second parties an option for the period of six months on all the water rights and water claims of every nature whatsoever, which the said first party may at this time own or hold in the following creeks in Elmore county, Idaho, to wit: Bennett Creek, Cold Springs Creek, Alkali Creek, Little Canyon Creek, and Dry Creek.

"It is understood and agreed by and between the parties hereto that this option may be extended beyond the period above named, for such time as will enable said second parties to thoroughly investigate the lands under the above described creeks; and the advisability of the water supply, and to determine and secure a reservoir site, if such plan is deemed advisable.

"If at the expiration of the said six months or at the expiration of such further time as may be needed as above specified, to thoroughly investigate said project, not to exceed 12 months in all, the above second parties find the project practicable, they agree to pay to the said first party, or his heirs or assigns, the sum of five thousand dollars ($5,000), and a paid up water right for eighty acres of land, described as follows; to wit, S. E. one-fourth of S. W. one-fourth of Sec. 29, and N. E. one-fourth of N. W. one-fourth, of Sec. 32, Tp. 5, S., R. 9., E. B. M.

"The said sum to be paid on or before twelve months from the date hereof, and said water right conveyed to the first party as soon as water can be delivered to and on said land from the proposed system, or any part thereof.

"It is further agreed that if at the expiration of the said six months period or such further time as may be necessary to investigate the said project as above set out, the parties of the second part deem the project impracticable and desire to abandon the same, they may terminate this option by giving notice thereof to said first party or his heirs or assigns, and at the expiration of said option, by notice as above set out, said second parties shall turn over to said first party or his heirs or assigns all maps, plans and data of every kind and description which they may have prepared or come into

possession of in connection with the irrigation in contemplation by the parties hereto.

"It is further agreed that if the second parties shall fail or neglect to make such payment at the time and in the manner aforesaid, or fail or neglect to convey said water right at the time and for the land aforesaid, they shall forfeit all right to the water rights referred to herein and all payments of money made to said first party, all improvements and all water rights, ditches and reservoirs whether completed or not, made in the prosecution of said system, shall be forfeited to said first party as liquidated damages.

"It is further agreed that said second parties hereto shall during the life of this option protect said first party in his filings on said above-named creeks.

"Subscribed the day and year above written.

(Signed)      "G. W. THOMPSON,

"H. R. GARD,

"J. H. PETERSON,

"L. G. BRADLEY."

The main issue on the trial was whether the appellants exercised the option given by said contract and purchased said water rights.

(1) The first error assigned is that the court erred in overruling the demurrers to the complaint. We think the complaint states a cause of action and the court did not err in overruling said demurrers, at least so far as these appellants are concerned. We think there were clear-cut issues made by the pleadings, and that the court did not err in holding the complaint sufficient.

(2) The next error assigned is the insufficiency of the evidence to support the verdict. The agreement, said Exhibit "A," clearly shows that it was an option to purchase. Said agreement recites that in consideration of certain matters the respondent "hereby give and grant to the said second party an option for the period of six months on all the water rights," etc.; that appellants "may terminate this option"; and that appellants "shall, during the life of this option, protect said party in his filings." The provision of

said contract in regard to the payment of $5,000 to respondent and the conveying to him of an eighty acre water right was simply the purchase price to be paid if said option was accepted. An option is not a sale. At best it is a right of election to exercise a privilege, and only when that privilege has been exercised by acceptance does it become a contract to sell. (*Hopwood v. McCausland*, 120 Iowa, 218, 94 N. W. 469.) Counsel for respondent contend that said agreement is more than an option to purchase,—that it is an option to purchase coupled with an agreement to buy in the event the appellants found the project referred to "practicable." Conceding that contention, that would not take the contract out of the category of an option, as it was left entirely with the appellants to determine whether they considered the project practicable. It was not intended to leave the determination of that question to respondent. The use of the word "option" in said contract excludes the idea of an absolute agreement to purchase, as an option is simply a contract by which the owner of property agrees with another that he shall have a right to buy the property at the price fixed within a certain time, and it is nothing more than a continuing offer to sell. This court held in *Kessler v. Pruitt*, 14 Ida. 175, 93 Pac. 965, that "an option to purchase does not become a contract to purchase until the privilege given by the option has been exercised by acceptance." It is clear to us that the appellants could not be bound under said option contract until they had accepted the option.

The water permits referred to in said contract were numbered 5821 and 5822, and were granted by the state engineer. Under permit No. 5821 the respondent claimed flood water equivalent to twenty cubic feet per second continuous flow; from Bennett creek, ten cubic feet; from Hot Springs, five cubic feet; from Dry creek, five cubic feet; and the amount of land to be irrigated thereby was 1,000 acres; estimated cost of the works, $8,000; works to consist of reservoirs, dams and ditches. Said application was filed in the state engineer's office at 9 o'clock A. M., November 2, 1908, and returned to applicant for correction on the same day, and the

corrected application was received by the state engineer November 23, 1908. It was thereafter examined by the state engineer and said permit was granted, subject to the limitations and conditions that work must begin on said system on or before February 4, 1909, and be continued diligently and uninterruptedly to completion unless temporarily interrupted by circumstances over which the permit-holder had no control. One-fifth of the work was to be done by June 5, 1911, and the whole of said work to be completed by December 5, 1913.

Permit No. 5822 was granted to respondent by the state engineer on the same date as permit No. 5821, and the quantity of water claimed therein was flood water equivalent to twenty cubic feet per second, and the source of supply was Alkali creek, five cubic feet; Little Canyon creek, ten cubic feet; Cold Springs creek, five cubic feet; and the amount of land to be irrigated was 1,000 acres. The estimated cost of construction of the works was $10,000. The permit was granted on December 5, 1908, and it was provided that work was to be begun thereon on or before February 4, 1909, and to be continued uninterruptedly to completion, unless temporarily interrupted by circumstances over which the permit-holder had no control. One-fifth of the work was to be done by June 5, 1911, and the whole of said work to be completed on or before December 5, 1913.

It will be observed that said option agreement was made on February 8, 1909, and it was admitted on the trial by the respondent that he had not begun work under said permits at the time said contract was entered into. It appears from the evidence that the day following the signing of said contract, to wit, February 9, 1909, the appellants employed two engineers for the purpose of proceeding under said option to determine whether said project was practicable. The appellants, said engineers and respondent went out on said project and looked it over, and on the same day returned to Boise City. Thereafter on the 11th of February, the engineer King reported that said project was not practicable; that instead of costing about $18,000, or about ten dollars per acre

for the 2,000 acres of land, as had been estimated by respondent, it would cost not less than $126,500 to construct the required reservoirs and canals, making it cost almost $65 per acre,—more than six times as much as respondent's estimate. . It appears that the respondent, at the time said contract was entered into, or the next day when the parties went to examine said project, handed to one of the appellants his said water permits with a map or maps, and that in making an examination of said project by said engineers said maps were referred to. After making said examination and on the return to Boise, the parties seemed quite well pleased with the project and, in order to secure other flood waters that might be available from said creeks, it was suggested that it would be well to procure other permits therefor, and one of the engineers and Mr. Gard prepared applications, and when prepared the defendant Peterson inquired of Gard who had better sign them and Gard suggested that Peterson do so, which he did, and the evidence shows that Peterson in making said filings did so for the purpose of tying up any flood waters from said streams not included in the Gard filings, so that in case said option was accepted, they would be able to control all of the flood waters from said streams. Those applications were made a day or two before the engineer had made his report as to the feasibility or practicability of said project.

The testimony on behalf of the appellants shows that when they received the report of the engineer, they had a consultation with the respondent at the Idanha Hotel in Boise, and gave him a copy of the report and there informed him that they would have nothing further to do with the proposed project, and returned to him the maps and papers he had delivered to them, and on the evening of that day the appellant Thompson left Idaho and was away for about two months. Gard denied on the witness-stand that they informed him at said meeting at the Idanha Hotel that they would have nothing further to do with said project, but did not deny that they handed him a copy of the report of the engineer. He also admitted that the appellants did not apply to him

for an extension of the six months' time given by the provisions of said contract, for the investigation of said project to determine its practicability. Gard admitted that Bradley offered to return said water permits to him, but that he (Gard) told him he "might as well keep them." Gard does not deny that it was clearly understood that the deal depended upon the result of the engineer's report and whether appellants concluded that the project was practicable. Notwithstanding the fact that Gard contradicted the testimony of appellants with reference to notifying him that they would not accept the option and that the deal was off, yet the facts show that neither the respondent nor appellants did by conduct or act in any way attempt to comply with the terms of the contract of option after appellants notified respondent on the 12th day of February, 1908, that they rejected the option; but the evidence does show that the option had been terminated and was completely abandoned by all the parties to the same. There is but one theory upon which the jury could have found there was a liability on the part of the appellants to the respondent under said agreement, and that is the theory upon which some of the instructions were based, which theory is clearly erroneous, as will be hereafter shown. It would appear that the jury disregarded the testimony and attempted to follow the law as given in the instructions. Gard testified that he informed the appellants at the time said option was given that defendant Hammett had surveyors in the field in the Medbury region with a view to bringing water there from the Malad river by an extension of the King's Hill ditch. It thus appears that Hammett had at that time in contemplation a purpose to extend the King's Hill project into that region and to irrigate a lot of land there by bringing water from the Malad river, which he later carried out by constructing canals, pipe-lines and flumes for the irrigation of much of the land in Medbury Valley, but has not constructed any system of irrigation whereby any of the water covered by the Gard or Peterson permits has been used.

Franklin, one of the engineers, who in connection with King, as chief engineer, investigated said project to ascertain

its practicability, testified that from the investigation they made they came to the conclusion that said project was not feasible or practicable, and that King, in a conference with Thompson, Peterson and Bradley, in regard to the feasibility of said scheme, advised them that it was not feasible or practicable.

Under the last clause in said option contract, it is agreed that the appellants shall during the life of said option protect the respondent in his filings on said named creeks. The filings there referred to are the two water permits above set forth, and the respondent testified that the applications for water permits by the appellant Peterson were intended to protect his two said permits, the idea being that said applications of Peterson superseded or absorbed the permits issued to the respondent, and that said Peterson thereby acquired all the rights which the respondent had acquired under his said permits, and on that theory counsel for respondent contend that by reason of the permits issued to Peterson there was no necessity for any conveyance to the said appellants of the rights acquired under the Gard permits. It is clear that since the applications for permits by Peterson were made on the 9th or 10th of February, 1909, and prior to the report of the engineer, Peterson's intention was not to acquire the rights that Gard had, but a right to all the surplus water over and above what had theretofore been granted by said permits to Gard, and that intention is clearly shown by the evidence; and as a matter of law, Peterson, by making such applications, could not acquire by any permit issued to him any rights that Gard had secured under his said permits. No conveyance has ever been tendered, so far as the record shows, by Gard, conveying whatever rights he had secured under his permits to the appellants, and said water permits have not been assigned to appellants or either of them. On the trial, it appears from the record that counsel for Gard took the position that said option agreement amounted only to a promise on the part of the respondent to give a quitclaim deed conveying to the appellants whatever rights he had secured under said permits in case they accepted said option. But

the evidence does not show that any quitclaim deed or other conveyance whatever was ever tendered to appellants, counsel for respondent evidently taking the position that there was no necessity for it as Peterson had acquired under his applications and permits all of the rights that had been given to the respondent under his permits.

In *Nielson v. Parker*, 19 Ida. 727, 115 Pac. 488, this court held that the state engineer had no right, power or authority to interfere with vested rights or to grant a permit for the appropriation and diversion of the waters of a stream where the same had already been appropriated. The state engineer has no power or authority to interfere with vested rights under a permit granted by him for the appropriation of water and thereafter grant a permit which would interfere with such vested rights. (See, also, *King v. Chamberlin*, 20 Ida. 504, 118 Pac. 1099; *Youngs v. Regan*, 20 Ida. 275, 118 Pac. 499.) It is clear under the law that the rights granted to Peterson under his permits did not interfere with or absorb any of the rights granted to Gard under his permits. The appellants therefore took no title to the rights acquired by Gard through or by Peterson's permits. Under the statutes of this state, a water right is real estate, and any interest therein is an interest in real estate, and if Gard secured a water right under his said permits, he could not transfer it to another except by a written conveyance such as would convey the title to real estate. (*McGinness v. Stanfield*, 6 Ida. 372, 55 Pac. 1020.) Conceding that Gard had acquired an interest in water rights by virtue of his said water permits, had the title to said water rights been finally perfected by a construction of the contemplated irrigation works, the legal title to said water rights would still have been in Gard and before the parties who constructed said irrigation works could get title thereto, it would require an assignment of such water permits or water rights or a conveyance thereof to such parties. At the time the respondent handed said permits to Bradley, there was no intention that said permits would become the property of Bradley or the appellants. Referring to appellants at that time, respondent Gard testified:

"They were examining them (the permits) and I simply handed them over to him, and he, I think, offered them back to me and I told him he might as well keep them." That was at the time the option was signed and before the engineers had examined said project and made their report thereon. He (Gard) further testified that he had never assigned or transferred said water permits to Peterson or to the appellants; that he had not transferred them to anyone up to the time of the trial.

Under said facts, whatever rights the respondent had secured under said permits did not become the property of the appellants, and it is contended by counsel for appellants that as said appellants abandoned all intention of accepting the provisions of said option contract, it did not devolve upon them thereafter to proceed under the law and carry out the provisions and requirements of said water permits in order to keep alive the rights granted to Gard thereby.

The evidence further shows that after receiving said report of the engineer, the appellant Bradley and the respondent Gard went to said project and made some further examination in regard to the lay of the country, reservoirs, sites, etc., and on their return to Glenn's Ferry they met a man by the name of McGuinness who owned a ranch on said Cold Springs creek, and McGuinness testified that Gard seemed discouraged and told him that the deal was off so far as he was concerned and that if he (McGuinness) could get said parties to accept a scheme that he had, it would be all right. However, Gard testified that he did not remember telling McGuinness that the deal was off. But McGuinness testified that after having that conversation with Gard, he felt free to enter into any negotiations in regard to water rights or reservoir sites with Bradley and his associates; that McGuinness then went to Bradley and told him he could show him a reservoir site or something he could handle, and requested him and Gard to remain until the next day and asked Gard to go with Bradley and look at a reservoir site on Cold Springs creek; that he sent Gard over to Corker's to borrow a transit to take along, and that Gard did so and he and Bradley went

to Cold Springs creek the next day and examined the Mc-Guinness reservoir site. From the record it appears that Bradley thought well of the McGuinness scheme and later took surveyors up to look it over.

In rebuttal the respondent testified that he thought Mc-Guinness was mistaken when he testified that he (respondent) had told him the deal on said option contract was all off and that McGuinness could interest the appellants in any project he had. However, he admits that at the suggestion of Mc-Guinness he went to Corker in Glenn's Ferry and borrowed a transit and remained over night at Glenn's Ferry, when he and Bradley had intended to return to Boise that evening, and the next morning they took the transit and went out to the Cold Springs creek reservoir site at the suggestion of McGuinness. This is certainly strongly corroborative of the statement of McGuinness to the effect that Gard seemed discouraged in regard to the transaction and told him that it was all off.

The record fails to shows that there was anything further particularly said or done in regard to the Gard permits until in July, 1909. In the meantime Gard had been at work for Bradley and the Medbury Water Co. and others. He testified that in July he told Bradley he wanted the money that was due him for work—some forty or fifty dollars, and also told him that was all he wanted—that he did not want the other money in dribs—that he wanted to get it in a bunch; that the money he asked for at that time was what was due him for work. He also testified that the next conversation he had in regard to the matter was with Thompson in Glenn's Ferry a day or two prior to the land opening or lot drawing which occurred on November 16, 1909. He testified that he stopped Thompson on the street and asked him what chance there was for getting some money on his contract, but he does not testify what reply Thompson made. He testified that Bradley had paid him five dollars on said option contract on the day the engineers and others were returning to Boise from an examination of said project, which was the day after said contract was made and before the engineers had reported on the feas-

ibility of the project. He also testified that in November
Bradley had allowed him $212.50 on said option agreement,
on contracts for town lots at said land opening at Hammett,
but he admitted that he had not received title to said lots nor
contracts for them. He testified that said lot scheme was a
sort of a drawing proposition and he had to wait until his
number was drawn out, and after that he wanted Bradley to
fix up the amount for him, and Bradley told him to give a
check, and Gard explained that he had no money in the
bank, and Bradley said, "That's all right; I'll take care of
it for you," and that he drew checks to the aggregate amount
of $212.50; that said checks were never paid and that Gard
understood they were to be paid out of the purchase price
of said permits. But it appears from the record that nothing
further occurred in regard to the matter; that the checks were
not paid and no contract for said town lots was ever issued
to the respondent.

Bradley explained the lot transaction as follows: Gard was
working for the company. He had been surveying and plat-
ting water acreage tracts. The company had not floated its
bonds and could not pay its help until after its opening, which
was on November 16th, and a lot of the boys who were work-
ing there wanted to use their wages to buy town lots or file
on acreage, and Bradley allowed each of them to do so and
to put up checks, and Bradley informed them that the amount
of the checks would be taken out of their wages. Gard told
him he would like to draw on a town lot and Bradley ex-
plained the process and he put up his check. He selected
a couple of town lots and gave his checks for the balance
of the payment. When he gave those checks, he was given a
receipt for the money in order to make the transaction com-
plete, and as soon as the contract could be filled out and re-
corded on the books, they were asked to surrender their
receipts and were given the duplicate contract, the company
keeping the original. But these were not given to Gard be-
cause he immediately went to Bradley and said he was not
ready to meet the checks, and asked him not to turn them
in, so Bradley attached the checks to the contracts and held

the contracts awaiting Gard's pleasure, as he did not feel like forcing him to buy if he did not feel able. It seems the Fruit Land Acreage Company was the owner of the town of Hammett and said town lot drawing was conducted by it. The evidence shows that the respondent was hard up and that the five dollars referred to was handed him by Bradley on their return trip from the investigation of said project on the 9th of February, 1909, and it does not appear from the record that it was the intention of the appellants to pay said five dollars on said contract or to make a payment thereon of $212.50 on the said town lot transaction. Said lot transaction occurred about the middle of November, 1909, and on the 2d of December following the respondent addressed to the appellants the following communication:

"Boise, Idaho, Dec. 2, 1909.
"Messrs. G. W. Thompson, L. G. Bradley, J. H. Peterson,
"Gentlemen:

"You will please pay to the order of Karl Paine the sum of $1,000 and charge the same to me, this being the amount due Mr. Paine under the agreement of February 8th, 1909, wherein I am the party of the first part and you are the parties of the second part, said agreement giving you an option on certain water rights held by me in Bennett Creek, Cold Springs Creek, Alkali Creek, Little Canyon Creek and Dry Creek, in Elmore county, State of Idaho.

(Signed) "HARRY R. GARD."

Respondent testified that he gave said order to his attorney, Mr. Paine, on December 2d, and had a conversation with Bradley about said order, and testified as follows: "I handed him (Bradley) that paper and told him under what circumstances I had signed it . . . . and he read it over and he says, 'Harry, I would sign that for you if it would do you any good, or indorse it, but,' he says, 'I don't know what Mr. Thompson will do,' or something to that effect—Thompson was the man behind the guns—and made some remark and walked out." Bradley testified that he had a conversation with the respondent in regard to Mr. Paine's little girl being sick and that he wanted to send her away—that he did not

remember of Gard's showing him any letter or the order; that if he did show him the same, that he did not read it for the reason that it was simply a transaction between them as to whether or not Gard could get a thousand dollars for Mr. Paine. Bradley also testified that there was nothing said in that conversation about said option contract.

One witness testified that the respondent had been telling Bradley about how he was approached at King's Hill a few days previously—or sometime in April, 1909—by Mr. Hogan. He said that Hogan had endeavored to secure the purchase of Gard's said filings, and Bradley said, "Never mind, Harry, we will take care of you all right," or words to that effect. The same witness testified that he was present when Gard presented to Bradley a paper, and after reading it Bradley handed it back to respondent and said he thought it would be all right with him, but he didn't know how it would be with Thompson. The witness referred to the said thousand dollar order. It does not appear that said order was ever presented to the appellant Thompson. The appellant Thompson testified that the respondent never mentioned or said anything to him about said option contract except once, and that was a day or two before this suit was brought. He testified that he met Gard very often after his return from the east and talked to him quite often, and nothing was ever said about said option contract; while Gard testified that he had several conversations with Thompson, but could recall only two, one at the Idanha Hotel when Thompson said to Gard, "Aren't you glad you met us fellows?" He was asked what led up to that statement or what caused Thompson to make it, and he testified, "I don't remember; he just looked at me and made that remark." And again when he met Thompson on the street in Glenn's Ferry just before the lot drawing and asked him what the chances were for getting some money on his contract and Thompson said, "It is not due yet, Gard, is it?" and Gard said, "Yes, sir; it certainly ought to be by this time; we are going ahead all right," and Thompson said, "Well, I will see Mr. Bradley and take it up with him; we are awfully busy now, so just kind of forget that for awhile."

It must be remembered that by the provisions of said option contract the $5,000 mentioned therein was not due until twelve months after February 8, 1909, and if said option had been accepted, would not have become due until February 7, 1910, more than two months after the date of said order.

As above shown, the permits issued to Gard required work for the construction of the irrigation works provided for therein to begin on or before February 4, 1909, and to be continued diligently and uninterruptedly to completion, and the record shows that there had been no construction work done whatever at the date of said option contract, February 8, 1909, nor had any been done when this action was tried, May 6, 1911. The fact that appellants did nothing to protect Gard's rights after they received the report of the engineer is strongly corroborative of the fact that they had declined the option.

Under the provisions of the statute then in force in regard to such permits (sec. 3254, Rev. Codes) the holder of any permit who shall fail to comply with the provisions of that section within the time or times specified, shall be deemed to have abandoned all rights under his permit, and the statute also provides that any subsequent permit-holder may contest any prior permit where the prior holder has failed to comply with the law in regard to the construction of the works therein provided for. The record does not show that anyone had contested Gard's rights under said permits, and Gard testified that he had never assigned or transferred said permits to anyone, and, as above stated, counsel for respondent during the trial took the position that said option agreement amounted only to a promise to give the appellants a quitclaim deed to whatever interest the respondent had in said permits.

The theory of counsel for respondent in regard thereto in the further proceedings at the trial appears to have been that Gard's water rights have been forfeited and abandoned and that appellants had secured the water which said permits called for through the issuance of permits to said appellant Peterson. However, this latter theory is negatived by the allegations of the complaint, wherein it is averred that Gard's

water rights "on the 8th day of February, 1909, were and ever since have been and now are of the value of $25,000." It would appear from that allegation that said water rights were still in existence and had greatly increased in value since the execution of said option contract. Gard testified that Peterson filed on additional water in Medbury Valley to protect his said permits; but as we view it from the record, this conclusion of the witness is not tenable, for the reason that Peterson made applications for said permits on the 10th day of February, 1909, before the engineer had made his report on the feasibility of the Gard project, and Peterson, by filing applications for permits in the same region covered by Gard's filings could not thereby acquire any rights that Gard had acquired prior to the time of filing Peterson's said applications. Peterson's applications did not and could not take over any rights secured by Gard under his permits, and the record shows that Peterson's filings were merely for the purpose of tying up what additional flood water there was on those streams, because it was believed that Gard's forty second-feet of water would be insufficient if appellants accepted said option and thereafter should conclude to develop a big project in Medbury Valley.

The trial court refused to permit appellants to show on the trial whether said Gard permits were valid and subsisting on February 8, 1909. There is no evidence in the record that shows or tends to show any transfer, assignment or conveyance of the said Gard permits to the appellants, and there is nothing to show that the rights secured thereunder have been abandoned or forfeited. It would appear that whatever rights Gard had at the time said option contract was entered into, he still has. The only thing he claims to have done to transfer his said rights was to hand his permits to Bradley. Simply because Peterson had filed other applications and procured other permits in the same region of country and from the same streams and has transferred his interests in such permits to the King's Hill Company, that would in no manner affect the rights of Gard under his permits. It also appears that all of the water used by the King's Hill Company in the

Medbury Valley has been brought there from the Malad river through the works of the King's Hill Co., and that company, the successor to Peterson under his permits, has done nothing toward constructing a system of irrigation as required by law, under said permits.

The King's Hill Extension Irrigation Company was incorporated on the 4th of May, 1909, with a capital stock of $200,000 for the purpose of reclaiming certain lands lying west of Glenn's Ferry and lands in Medbury Valley and elsewhere, and its main source of water supply was from the Malad river, and up to the time of the trial it had only used water from said river and had not procured any water for irrigation by, through or under said Peterson permits, and had performed no work looking toward the construction of the irrigation systems contemplated by said permits. Said permits were assigned to said company on May 6, 1909, for a consideration of ten dollars. But Peterson did not attempt to assign or transfer the Gard permits or water rights to said company.

The question whether the appellants accepted said option and are bound by said agreement is controlling in this case, and after a careful examination of all of the evidence we are fully satisfied that the great preponderance of the evidence shows that they did terminate said option and notified the respondent to that effect on the 12th of February, 1909, when they gave him a copy of the engineer's report which showed that it would cost about $126,500 to construct the systems that according to respondent's estimates, as shown by his permits, would require but $18,000. While Bradley and Thompson both testified that they told him at that time that they would proceed no further with the proposition, the respondent testified that they did not so notify him, but he does not testify that they told him that they would accept the proposition, and the physical facts and circumstances clearly corroborate the testimony of appellants on that point. In our view of the matter, there is no substantial evidence to show that appellants ever accepted said option.

There does not appear to be anything in the contention of the respondent that they paid Gard five dollars on said contract on February 9, 1909, or that they gave him credit on two lots on said contract for $212.50. Bradley no doubt had some hopes of making some money out of the King's Hill proposition and felt very kindly toward respondent, and, according to his testimony, intended to do something for him in case he made anything out of the proposition.

There is nothing in the contention of respondent that his rights were absorbed by the Peterson filings. Under the law, transfers cannot be made in that way and the evidence shows that it was not the intention to make a transfer of respondent's rights in that way. The Peterson filings were made before the engineer had made his report. Under that option agreement, the appellants were not required to get the consent of the respondent to refuse or decline to accept its provisions. They were the exclusive judges of whether they found said proposition practicable and they had absolute right and authority under said option contract to decide that question for themselves, and the evidence shows clearly that they did decide it and decided against accepting it. The court evidently proceeded upon the theory of counsel for respondent, to the effect that the consent of respondent must first be obtained before appellants could decline to accept said option, which is an erroneous theory.

After declining to accept said option, appellants had the right and authority to assist in the organization of the King's Hill Extension Co., which company undertook to irrigate a large tract of land west of Glenn's Ferry and in and around Medbury, and if in doing so they in any manner trespassed on the rights of the respondent, he surely has his remedy, but not by trying to enforce an option that had been declined and refused by appellants. The respondent had not been deprived of any property rights by the refusal of appellants to accept said option, so far as appellants are concerned. The evidence is clearly insufficient to sustain the verdict and there is no substantial evidence in the record to support it. In a case where the giver of an option to purchase real estate is

attempting to establish an acceptance of such option, his proof of acceptance must be clear and convincing. In the case at bar, the proof falls short of such requirement.

(4) The giving of certain instructions by the court is assigned as error. That part of instruction No. 1 objected to is as follows:

"You have no right to disregard the testimony of any witness; it is your duty to give careful consideration and weight to the testimony of every witness that has appeared upon the witness-stand for either the plaintiff or defendant; that is a part of your duty; and wherever a witness has made a statement that is not corroborated you should take that into consideration; that is a matter for your thought when you go to your jury-room."

That instruction was excepted to on the ground that it was prejudicial to tell the jury that it had no right to disregard the testimony of any witness; that as there was a conflict in the testimony it was impossible to believe every witness as a whole. That instruction is not technically correct, yet we think it is sufficiently cured by other parts of the instruction. When there is a direct conflict in the evidence, the jury has a right to reconcile the evidence as far as possible, and if it is impossible to do so, they may disregard the testimony of a witness if his evidence shows he is not worthy of belief, but they should not attempt to disbelieve a witness out of prejudice or caprice, and the testimony of a witness should not be disregarded by the jury simply because it has not been corroborated.

Instructions Nos. 2 and 4 objected to are as follows:

2. "If you find from the evidence that the plaintiff and the defendants, Thompson, Bradley and Peterson, made and entered into the agreement on which this action is based, and that the defendant Peterson transferred to the defendant King's Hill Extension Irrigation Company, Ltd., the water rights appropriated in his name to be used in the irrigation of the lands embraced in the project referred to in said agreement and as a part of said project, and that the defendants found the project referred to in said agreement practicable and that

they organized or caused the same to be organized, then your verdict should be for the plaintiff, although you also find from the evidence that the said defendants notified plaintiff that they deemed said project impracticable and that they desired to abandon the same.''

4. ''The court instructs you, gentlemen, that the liability of the defendants is not to be determined by you upon the question of whether or not the defendants notified plaintiff that they deemed the project referred to in said agreement impracticable and that they desired to abandon the same, as claimed by them, but whether as a matter of fact they did find said project impracticable and did abandon the same.''

Instruction No. 2 is clearly erroneous and contrary to law. There the jury is instructed if they found from the evidence that plaintiff and defendants made and entered into said option agreement and that Peterson transferred to the defendant, the King's Hill Extension Irrigation Co., Ltd., the water rights appropriated in Peterson's name, and that such water rights were to be used in the irrigation of the lands embraced in the project referred to in said agreement, etc., that their verdict should be for the plaintiff. This action is based on Gard's water rights and not on Peterson's permits, and by that instruction the court assumed that Peterson by his permits had acquired the rights of Gard, or that Gard had transferred his rights to Peterson. Such assumption is absolutely erroneous. The court no doubt proceeded upon the theory that Peterson by his permits had acquired all the rights that Gard held under his permits, which is clearly erroneous. Under the evidence Gard never has conveyed or assigned his rights to the appellants or to either of them, and Peterson did not acquire Gard's rights through permits issued to him. The mere fact that the lands embraced within the Gard permits were also included in the Peterson permits does not transfer the Gard water rights to Peterson. The court no doubt assumed, from the mere fact that Peterson had secured water permits subsequent to Gard, that he thereby absorbed and acquired Gard's water rights, when he did not do so. The court in that instruction refers to lands embraced in

the Gard irrigation project, when there is nothing in said option agreement that requires Gard to transfer to appellants the Gard irrigation project, as the option was given on the Gard water rights, the object and purpose being to procure whatever water rights defendant had, provided they found the project practicable. They did not find that project practicable, and simply because they joined with Hammett in the King's Hill project and included in that project a part of the lands in the Gard project is no evidence that they did in fact find the Gard project practicable and that they did not abandon the same.

Any information that the appellants acquired in regard to lands or irrigation schemes while investigating the project contemplated by the Gard permits would not make them in any way liable to Gard if they entered into any other irrigation scheme, such as they did by assisting in the organization of the King's Hill Extension Co. The consideration for said option agreement was Gard's water rights and not any services he might render them in calling their attention to matters that led them to organize said King's Hill Extension Irrigation Co. It would be a peculiar proposition if one would become liable to another for calling his attention to what might afterward lead to an organization of an irrigation company for the reclamation of thousands of acres of land, when the project to which his attention had been called was for the irrigation of a small tract of land. Said instruction was misleading and contrary to law and should not have been given.

By instruction No. 4 the jury are instructed that the liability of the defendants is not to be determined upon the question whether or not defendants notified respondent that they deemed the project impracticable and that they abandoned it, but whether or not they did find said project impracticable and did abandon the same. The court in the first part of that instruction takes from the jury the determination of the question whether the defendants notified plaintiff that they deemed said project impracticable and that they desired to abandon the same. That was the very question that the jury

was first to determine, and the court there instructs the jury that it made no difference whether the plaintiffs notified them or not that they had found or considered the project impracticable and abandoned the same, and puts the question directly to the jury as to whether appellants did in fact find said project impracticable and did in fact abandon the same, regardless of the fact that they had notified respondent that said project was impracticable.

The court instructed the jury by instruction No. 2 that if the appellants had organized another irrigation project and included therein the land included in the Gard project, or a part of it, they would be liable under said contract, as by doing that they had in fact found the project practicable. Throughout the trial it was the theory of the plaintiff that because Peterson had conveyed whatever water rights he had secured under his permits to the King's Hill Extension Company, and as the project of that company contained some of the lands included in the Gard project, appellants had thereby found said Gard project practicable and were liable under said option agreement. That position is clearly erroneous. Entering into the option contract and declining to purchase the Gard water rights would in no manner prevent or prohibit the appellants from organizing another project which included a part or even all of the lands included within the Gard project; and it should be borne in mind all the time that the purpose of entering into said option contract was to purchase Gard's water rights. It was the water rights for which the appellants were to give $5,000 in cash and a paid-up water right for eighty acres of land, and not the Gard project. That project alone might not be practicable, but some of the land included therein might be taken into another project without making appellants liable under said option agreement. It was known to Gard at the time said option agreement was entered into that Hammett had his surveyors in the field, and was surveying an irrigation system which was intended to include lands west of Glenn's Ferry and in Medbury Valley. The fact that Gard's water rights were never transferred to the appellants and Peterson's permits in no

way absorbed Gard's permits, and the fact that Peterson thereafter transferred his permits to the King's Hill Extension Irrigation Company do not show that appellants had found said Gard project practicable.

Said instructions are clearly misleading and erroneous and should not have been given, and prejudiced the rights of appellants. The admission and rejection of certain evidence also tended to create such prejudice.

Instruction No. 5 proceeds upon the theory that this is an action to recover for the purchase price of the Gard water rights, when in fact the complaint and the prayer thereof clearly indicate that it is not an action to recover the purchase price, but is an action for a forfeiture, or, in case a forfeiture cannot be had, for damages. Said instruction under the pleadings was clearly erroneous and should not have been given. This action should have been determined upon the theory that it was an action to obtain a decree of forfeiture or, in case a forfeiture could not be had, for damages, as that was clearly the theory of the complaint and the complaint was not amended during the trial.

(5) The penalty provided in said option agreement was a forfeiture of the water rights referred to therein and the money paid on such contracts and all improvements in the way of ditches and reservoirs made in the construction of said system. As above held, the option was not accepted; no payments were made and none of the contemplated improvements by way of ditches and reservoirs were made. Said contract provides that ''they shall forfeit all right to the water rights referred to herein and all payments of money made to said first party, all improvements,'' etc., but as they never had received said water rights, nor paid any money nor made any improvements, had appellants accepted the option, the plaintiff could not have received anything as a forfeiture under the provisions of said contract. Even if the appellants had accepted said option and failed to perform, the contract specifically provides what the respondent should receive back and what appellants should forfeit.

As to the eighty acre water right: The contract provides that said water right must be conveyed to the first party as soon as water can be delivered to and on said land from the proposed system or any part thereof. As the proposed system has not been constructed, said water right is not due and would not become due, had the option been accepted, until water could be delivered to said land from the proposed system.

The verdict of the jury was clearly erroneous in awarding any sum whatever for said water right. As we view the allegations of the complaint, the action was brought for actual damages or a forfeiture because of the failure of the appellants to perform their part of an option contract. The damages contemplated appears to have been for the loss of a bargain, and the jury was instructed on the theory that the action was one for the purchase price of water rights. The question as to the right of the appellants to terminate said agreement by notice given to the respondent was virtually taken from the jury and the question submitted whether the project which the parties had contemplated had been found practicable and had been organized. There is no substantial evidence to show that it was found practicable or that it had been organized.

Other errors are assigned in regard to the admission and rejection of certain evidence offered, but in view of the conclusion reached in the foregoing opinion, it will not be necessary for us to pass upon them.

On the whole record the errors appear so prejudicial as to require a reversal of the judgment. The judgment is therefore reversed and the cause remanded for further proceedings in accordance with the views expressed in this opinion.

Stewart, C. J., and Ailshie, J., concur.

Petition for rehearing denied.