700 P.2d 964

**Earl F. McGILL, Plaintiff-Respondent,**

**v.**

**Elmer LESTER and Jane Doe Lester, husband and wife; John Hibnes, Sr. and Jane Doe Hibnes, husband and wife; and John Hibnes, Jr. and Jane Doe Hibnes, husband and wife, Defendants-Appellants.**

**No. 14686.**

Court of Appeals of Idaho.

May 30, 1985.

Rehearing Denied June 25, 1985.

See also, 105 Idaho 692, 672 P.2d 570.

Steve Adamson and Henry McQuade (argued), Adamson, Young & McQuade, Nampa, for defendants-appellants.

Merlyn Clark (argued) and Linda L. Holdeman (Hawley, Troxell, Ennis & Hawley), Boise, for plaintiff-respondent.

BURNETT, Judge.

We are asked to decide whether an "option" to purchase real property should be treated, under the circumstances presented here, as a lien rather than as a contract of conveyance. This question arises from a dispute among several would-be purchasers of the subject property. The trial judge resolved the dispute against those who claimed under the "option," holding that they had acquired nothing more than a lien to secure a debt. For reasons explained below, we uphold that determination. However, we also remand the case for reconsideration of costs and for an award of prejudgment interest on the secured debt.

## I

The facts are extraordinarily complex. We will simplify and summarize the facts pertinent to our decision, as found by the trial judge. In 1968 Chester and Lucille Skidmore, record owners of property in Nampa known as the Twi-Lite Lounge, entered into an installment sale contract with buyers named Miller and Anderson. In 1970 Miller-Anderson entered into another installment sale contract, transferring their interest in the Twi-Lite Lounge to Donald Fretwell. While Fretwell was in possession, the property was heavily damaged by fire. In addition, Fretwell became indebted to a group of creditors comprised of Elmer Lester, John Hibnes, Sr., John Hibnes, Jr., and their spouses. The Lester-Hibnes group sued Fretwell to collect the debt and caused a writ of attachment to be issued against Fretwell's interest in the property. Lester-Hibnes also obtained from Fretwell an assignment of his interest, promising to reconvey it if he paid the money he owed them. Ultimately the suit was dismissed, and the writ became ineffective, without payment of the debt. Fretwell also eventually defaulted on his contract with Miller-Anderson, resulting in a forfeiture.

After the forfeiture, but while the debt collection suit was still pending, Lester-Hibnes contacted Miller-Anderson directly. They stated that they had a lien on the property, securing the debt owed them by Fretwell, and they negotiated an "option" to purchase the property from Miller-Anderson. The "option" provided that if Lester-Hibnes made the payments past due under the Fretwell contract, Miller-Anderson would sell their interest to Lester-Hibnes on the same terms previously extended to Fretwell. The "option" agreement also contained a secondary provision that if a third party, Neoma Aurey, paid Lester-Hibnes what Fretwell owed them, she—not they—would be entitled to purchase Miller-Anderson's interest. Aurey failed to perform. Consequently, Lester-Hibnes exercised the "option" by making the payments past due on the Fretwell contract. But having done so, Lester-Hibnes thereafter made no further pay-

ments nor did they take possession of the property.

In May, 1972, Miller-Anderson sold their interest to Earl F. McGill. Miller-Anderson informed McGill that Lester-Hibnes had some claim against the property and McGill responded, according to the trial judge, that he would "cross that bridge when [he] came to it." McGill made a cash payment to Miller-Anderson and he received a deed which he recorded. He also made payments on the original contract between Miller-Anderson and the Skidmores. He took possession of the Twi-Lite Lounge, removed encumbrances against it, repaired the fire damage and eventually leased the property to a tenant who operated a night club.

As part of his effort to redevelop the property, McGill filed this quiet-title action against numerous defendants, including Lester-Hibnes, Miller-Anderson and Fretwell. During several years of litigation and settlement, competing claims to the property were narrowed to those asserted by McGill and Lester-Hibnes. The trial judge declared McGill to be the owner of the property, subject to the record title reserved by the Skidmores until their contract was fully performed. The judge held that Lester-Hibnes were entitled to a lien securing the Fretwell debt together with the payment they made when exercising the "option." Not satisfied with this result, Lester-Hibnes appealed.

The appellants' brief contains fourteen "assignments of error." But the dispositive question, generally stated, is whether the trial judge made findings supported by the evidence, and correctly applied the law, in determining that Lester-Hibnes did not receive an ownership interest in the property. The "assignments of error" also raise secondary questions regarding prejudgment interest and costs, to which we will turn after discussing the ownership issue.

## II

Lester-Hibnes' claim of an ownership interest necessarily rests either upon

the assignment they received from Fretwell or upon the "option" they received from Miller-Anderson. However, it will be recalled that Fretwell's interest was forfeited. Although the validity of the forfeiture initially was contested below, we find no basis in the record to disturb the trial judge's determination that a forfeiture occurred. The assignment received from Fretwell was extinguished by the forfeiture of Fretwell's interest. *See Rush v. Anestos,* 104 Idaho 630, 661 P.2d 1229 (1983). Consequently, the focus of the ownership issue shifts to the "option" received from Miller-Anderson.

■ An option, when exercised, is a contract for the conveyance of property. However, a conveyance which appears absolute in form may be shown by extrinsic evidence actually to be security for a debt.[1] Idaho Code § 45–905 provides as follows:

> The fact that a transfer was made subject to defeasance on a condition may, for the purpose of showing such transfer to be a mortgage, be proved (except as against a trustee under any trust deed or transfer in trust, or a subsequent purchaser or encumbrancer for value and without notice), though the fact does not appear by the terms of the instrument.

This statute embodies the familiar maxim that "equity considers that as done which ought to be done." Thus, a deed may be shown actually to be a mortgage, *Credit Bureau of Preston v. Sleight,* 92 Idaho 210, 440 P.2d 143 (1968), and the apparent conveyance of an ownership interest under an installment sale contract may be shown actually to be the creation of a security interest. *Rush v. Anestos, supra.* Upon a proper showing, the form of an instrument yields to its underlying purpose. *See generally Kendrick v. Davis,* 75 Wash.2d 456, 452 P.2d 222 (1969). In our view, this principle logically would extend to a purported "option" if the underlying purpose were merely to secure a debt.

■ The criteria for evaluating such a purpose are (a) the existence of a debt to be secured; (b) survival of the debt after execution of the instrument in question; (c) any previous negotiations of parties; (d) the inadequacy of consideration for an outright conveyance; (e) the financial condition of the purported grantor; and (f) the intention of the parties. *See Dickens v. Heston,* 53 Idaho 91, 100–05, 21 P.2d 905, 908–10 (1933). We will examine these factors in turn.

■ The threshold, and dominant, criteria are whether a debt existed and whether it survived the execution of the instrument. *See Credit Bureau of Preston v. Sleight, supra.* We have noted how Lester-Hibnes, while the writ of attachment was outstanding, represented to Miller-Anderson that they had a lien on the property for the debt owed them by Fretwell. Miller testified that he and Anderson accepted this representation and that they agreed to pay Lester-Hibnes from any insurance proceeds received on the fire-damaged premises. The sale to McGill occurred before such a payment was made. As a matter of law, it is doubtful that Lester-Hibnes actually possessed an enforceable "lien" on the property, as opposed to an encumbrance upon Fretwell's transitory interest. But the important facts, as found by the trial court, are that Lester-Hibnes asserted such a lien and Miller-Anderson, believing the assertion, actually agreed to treat Fretwell's debt as one they would discharge. We believe the existence of a debt is demonstrated in these unique circumstances. Further, we deem it clear that the debt survived execution of the "option." Miller-Anderson's agreement to pay Lester-Hibnes contemplated future performance—a payment from insurance proceeds

---

1. The proof must be by clear and convincing evidence. *E.g., Gem-Valley Ranches, Inc. v. Small,* 90 Idaho 354, 411 P.2d 943 (1966). However, no issue concerning this standard of proof has been raised in the instant appeal, and we will not address it *sua sponte.* In any event, regardless of the burden of proof at trial, the standard of appellate review remains whether the facts found by the district judge are supported by substantial evidence and, therefore, are not clearly erroneous. *E.g., Kreiensieck v. Cook,* 108 Idaho 657, 701 P.2d 277 (Ct.App.1985).

when received unless the debt were earlier discharged by Neoma Aurey as provided in the "option."

The other criteria also point to the "option" as a security device. The prior negotiations, when Lester-Hibnes took a short-lived assignment of Fretwell's interest and promised to reconvey if he paid them, indicate that Lester-Hibnes were bargaining not for ownership of the premises but for recovery of the debt owed them. Similarly, the "option" itself, giving Neoma Aurey the first opportunity to buy Miller-Anderson's interest if she paid Lester-Hibnes, evinces an intent simply to collect the debt. The trial judge made no findings, and the record is silent, concerning the financial condition of Miller-Anderson when they signed the "option." However, the record contains further indications that the "option" was given to secure the perceived obligation to Lester-Hibnes. The amount paid by Lester-Hibnes for the "option" merely covered Fretwell's delinquent payments and did not compensate Miller-Anderson for their ownership "equity"—i.e., the remaining balance (approximately $15,000) on the Fretwell contract. Lester-Hibnes tendered no further payments on that contract or on the Skidmore contract. In contrast, when Miller-Anderson later sold to McGill, they received $10,000 cash for their "equity" and McGill thereafter made the payments on the original Skidmore contract. Moreover, Miller testified that Lester-Hibnes said they were "not club operators" and that "[t]hey just wanted their money back...." Neoma Aurey gave virtually identical testimony, stating that the "option" was intended as a means for Lester-Hibnes to get "their money back."

John Hibnes, Jr., offered opposing testimony. He stated that the Lester-Hibnes group intended to acquire ownership. As Chief Judge Walters' dissenting opinion illustrates, the Lester-Hibnes side of the case is not without some support in the record. But in the last analysis, where

testimony is conflicting, the tasks of weighing the evidence and assessing credibility fall within the province of the trial court. *Rasmussen v. Martin,* 104 Idaho 401, 659 P.2d 155 (Ct.App.1983). In view of all the evidence summarized in this opinion, we sustain the trial judge's finding that the purpose of the "option" was to secure a debt. We uphold the court's conclusion that the "option" did not convey an ownership interest to Lester-Hibnes.

III

Next we consider the secondary issues of prejudgment interest and costs. The trial judge ruled that Lester-Hibnes were entitled to an "equitable lien" securing an amount equal to the debt owed them by Fretwell plus the payment they made when exercising the "option." [2] The judgment recited that the aggregate sum would bear interest "hereafter." A motion seeking to alter the judgment, by adding prejudgment interest, was denied. We believe the motion should have been granted.

Prejudgment interest is allowed where the amount claimed is liquidated or may be ascertained by mathematical computation. *E.g., Obray v. Mitchell,* 98 Idaho 533, 567 P.2d 1284 (1977); *Taylor v. Herbold,* 94 Idaho 133, 483 P.2d 664 (1971). If it is not clear, as in this case, when the sum claimed became due, interest should be allowed from the date the action was commenced. *Obray v. Mitchell, supra.* Here, the sum claimed was ascertainable by mathematical computation. Therefore, on remand the trial court is directed to modify the judgment by including prejudgment interest, computed at statutory rates applicable to the time periods embraced by this lawsuit. *See* I.C. § 28–22–104 and its predecessors.

McGill has argued that prejudgment interest is inappropriate because he offered before litigation to pay Lester-Hibnes' claim. This, of course, is not entirely consistent with his contention, mentioned at

2. In argument before our Court, McGill has questioned whether his interest in the property should be charged with either of these sums. However, he did not cross-appeal the judgment. Accordingly, the issue is not properly before us and, as mentioned in footnote 1, *supra,* we will not address such an issue *sua sponte.*

footnote 2, that he should not be obliged to make any payment. But in any event, it appears that the prelitigation offer was conditioned upon Lester-Hibnes' relinquishment of any ownership claim to the property. No actual tender occurred. McGill has retained the use of the money. Under these circumstances we believe McGill's offer does not defeat an award of prejudgment interest. *Cf. Packard v. Joint School District No. 171*, 104 Idaho 604, 661 P.2d 770 (Ct.App.1983) (offer to pay judgment, unaccompanied by tender, and conditioned upon dismissal of cross appeal, does not terminate accrual of judgment interest).

■■■ We turn finally to the question of costs. Lester-Hibnes contend that McGill should not have received a cost award at trial because he did not entirely prevail and because, in any event, costs should have been apportioned among all defendants originally named in the quiet-title complaint. When two parties, or sets of parties, partially prevail in litigation, the trial court may, in its discretion, determine which of them has prevailed for the purpose of awarding costs. I.R.C.P. 54(d)(1)(B); *Ace Realty, Inc. v. Anderson*, 106 Idaho 742, 682 P.2d 1289 (Ct.App.1984). Because our decision concerning prejudgment interest might affect the trial judge's perception of the extent to which any party has prevailed, we direct the trial court to reconsider costs on remand. If costs again are awarded to McGill, the court should determine whether, or to what extent, apportionment among all defendants would be just.

In summary, the judgment of the trial court, insofar as it quiets title in McGill and imposes a lien in favor of Lester-Hibnes, is affirmed. The case is remanded for an award of prejudgment interest to Lester-Hibnes and for reconsideration of costs. No costs or attorney fees awarded on appeal.

SWANSTROM, J., concurs.

WALTERS, Chief Judge, dissenting.

I respectfully dissent from the opinion of the Court. While it is conceivable that a duly exercised option to purchase realty might, in certain circumstances, be given legal effect as a security interest, the facts do not justify such a result in this case. By the Court's opinion, a clearly worded option to purchase is transformed into a mortgage by the testimony of other interested parties as to their belief of Lester-Hibnes' intent ten years earlier. The record indicates one of the *reasons* Lester-Hibnes entered into the option agreement was to protect their interest in Fretwell's equity in the property, but absolutely no evidence indicates the exercised option was enforceable as a lien for repayment of a debt. When determining the effect of a deed absolute on its face—or, as here, an unequivocal option to purchase—as a mortgage, the dispositive question is whether a debt remains after execution of the instrument. After noting the factors listed in *Dickens* which are recognized by the foregoing majority opinion, our Supreme Court stated in *Credit Bureau of Preston v. Sleight*, 92 Idaho 210, 216, 440 P.2d 143, 149 (1968), that "[w]hile all these factors are to be considered, the controlling test to be applied is whether the grantor sustains the relation of debtor to the grantee after the execution of the instrument." No evidence in the record indicates, and no one contends on appeal, that Miller was a debtor to Lester-Hibnes after the option was exercised.

Nor am I convinced the evidence yields favorable responses to the criteria listed in *Dickens*. For example, in considering the second factor, the majority indicates it believes the debt survived execution of the option because Miller-Anderson's agreement to pay Lester-Hibnes contemplated future performance. The Court's opinion does not explain how Lester-Hibnes could use the option to enforce payment of a perceived debt. In fact, there was no legally recognizable debt until the trial court in its judgment created a lien in favor of Lester-Hibnes. Even so, McGill offered to pay $12,000 to Lester-Hibnes in the summer of 1972, but Lester-Hibnes declined to withdraw their claim, insisting they were the equitable owners of the property by

virtue of their exercise of the option to purchase. The majority also places significance on the payment Lester-Hibnes made to Miller-Anderson because it "merely covered Fretwell's delinquent payments and did not compensate Miller-Anderson for their ownership 'equity'—i.e., the remaining balance (approximately $15,000) on the Fretwell contract." But Lester-Hibnes, by exercising the option, obligated themselves in writing to assume the Fretwell contract terms. Thus, Miller-Anderson would receive compensation for their equity in installments. The Miller-Anderson/McGill transaction appears to be an assignment, in exchange for immediate cash payment, of Miller-Anderson's right to receive installment payments according to the terms extended to Fretwell. Lester-Hibnes also agreed in writing to assume the Skidmore payments, and McGill did not. Lester-Hibnes maintained at trial they tendered no further payments on the Fretwell or Skidmore contracts because Miller-Anderson did not establish an escrow account or provide Lester-Hibnes with escrow instructions. Shortly after they exercised the option, Lester-Hibnes were faced with McGill's claim to the property. I believe much in the record is consistent with Lester-Hibnes' assertion that they intended, by exercising the option, to purchase the property.

An option creates in the optionee an opportunity for a limited time to purchase the property for a specified price. *Gard v. Thompson*, 21 Idaho 485, 123 P. 497 (1912). For the period fixed by the option, the optionor is committed, unless the option is revocable, to make a sale to the optionee at the latter's election. *Crockett v. Lowther*, 549 P.2d 303 (Wyo.1976). When the optionee elects to purchase within the time specified in the option, a bilateral contract binding on both parties is formed. *Boothe Financial Corporation v. Loretto Block, Inc.*, 97 N.M. 496, 641 P.2d 527 (App.1982); *Crockett v. Lowther, supra*. Upon exercise of an option to purchase, the optionee becomes the owner of a contract interest in the property as the vendee under the exercised option. 77 AM.JUR.2d *Vendor and Purchaser* § 46, 230–31 (1975).

The record in this case indicates that Lester-Hibnes sought the option from Miller-Anderson because Fretwell had defaulted on his purchase of the property. By purchasing the property on the same terms available to Fretwell, Lester-Hibnes could later sell the equity Fretwell had acquired in the property, thereby recouping the amount owed to them by Fretwell. The option agreement was not rendered less effective if Lester-Hibnes, by exercising the option, hoped eventually to recover a debt. After Lester-Hibnes elected to purchase the property, Lester-Hibnes became an equitable owner of the property. Because McGill purchased from Miller-Anderson with notice of an interest claimed by Lester-Hibnes in the property, McGill is not entitled to the protection afforded a bona fide purchaser under I.C. § 55–812. McGill's interest in the real property remains subject to the prior contract of Lester-Hibnes to purchase the property. Accordingly, I would reverse the trial court and remand for a determination of the equitable lien, if any, McGill (not Lester-Hibnes) is entitled to in the property.