732 P.2d 355

**Bill GILBERT and M. Maxine Gilbert, husband and wife, Plaintiffs-Appellants and Cross-Respondents,**

v.

**CITY OF CALDWELL, A Municipal Corporation of the State of Idaho, Defendant-Respondent,**

and

**Tony Russell Construction, Inc., a foreign corporation authorized to do business within the State of Idaho, Defendant-Respondent and Cross-Appellant.**

No. 15990.

Court of Appeals of Idaho.

Jan. 29, 1987.

Wayne E. Davis and Ronald P. Rainey (argued) (Alexanderson, Davis, Rainey, Whitney & Kerrick), Caldwell, for plaintiffs-appellants and cross-respondents, Gilbert.

Charles A. Smyser, Boise, for defendant-respondent, City of Caldwell.

Richard C. Boardman (argued) and Paul S. Penland (Penland & Munther, Chartered), Boise, for defendant-respondent and cross appellant, Tony Russell Construction, Inc.

WALTERS, Chief Judge.

Bill and Marie Gilbert of Caldwell granted an easement to the City of Caldwell to permit a new sewer main to cross their commercial property. They were not satisfied with the reconstruction of the site following installation. Nor were they satisfied with the damages awarded by the district court following trial. Their appeal raises the following issues: (1) whether the district court erred in finding the city was not bound by any promise to restore the Gilberts' property to "as good or better" condition; (2) whether the district court's finding that the Gilberts did not rely upon any such promise is contrary to the evidence; (3) whether the district court erred in characterizing a view of the site by the

court as "evidence;" (4) whether only the promisor of a contract is liable to a third-party beneficiary; (5) whether the cost of repairs which would satisfy the intent of the contract, but not comply with contract specifications, was available to the court as a measure of damages in this case; and (6) whether the court erred by denying certain consequential damages and costs. On cross appeal, the contractor—Tony Russell Construction, Inc.—presents an additional issue: whether, for purposes of Idaho's offer of judgment rule, I.R.C.P. 68, the offers of multiple defendants should be compared individually or collectively to the plaintiff's recovery. We affirm the district court's judgment with respect to liability, but remand for a redetermination of certain damages. We affirm the district court's award to the Gilberts of costs accrued after the offers of judgment.

In pursuing the East Cleveland Sewer Project, the City of Caldwell determined that easements across private property were needed. City officials sought the support of the Chamber of Commerce and others for this project. As a result, V.E. Graves, a private citizen, contacted Mr. Gilbert and other property owners to request the donation of certain easements. After making further inquiries of city officials and obtaining special consideration, the Gilberts granted the easement as requested.

The Gilberts' commercial property bordered a thoroughfare in Caldwell. The proposed easement ran along a portion of the front of their property. Although an open drainage ditch lay between the easement and the street on this part of the frontage, the Gilberts were concerned that the construction would interfere with access and parking for businesses then leasing the site from the Gilberts. They also were concerned that the construction might impair future development of the property.

To appease the Gilberts, the city added certain terms to its contract with Tony Russell Construction, Inc. (TRC), the construction contractor. These provisions included limiting construction on the Gilberts' property to non-business hours and

to a nine-day period. The city notified the Gilberts that these terms would be included in the city's contract with TRC. After commencing construction TRC determined that construction during non-business hours was impractical. TRC then independently contracted with the Gilberts to permit construction during business hours. Pursuant to this contract, TRC posted a $5000 performance bond with the Gilberts and proceeded with the project. The sewer line was laid in a v-shaped trench approximately five-hundred feet long, twenty feet deep and twelve feet wide at the surface. Approximately one-half of the length of the line lay under a paved access and parking area. The remainder was under an area where one of the Gilberts' tenants, an automobile salvage operation, stored some of its vehicles.

Following installation of the sewer line, the Gilberts were not satisfied with TRC's reconstruction of the site and filed this action. They contended that the backfill in the sewer trench was not compacted as agreed, that the value of their property was reduced, and that they were entitled to additional compensation pursuant to their agreement to permit work during business hours. The Gilberts initially sought over $160,000 in damages on contract and tort theories. The tort claims were voluntarily dismissed, leaving their claims on contract theories of approximately $111,000.

Following a non-jury trial, the district judge found TRC liable for deficiencies in the fill condition. TRC and the city were found jointly and severally liable for interruption of business. The court awarded $4989 to the Gilberts for defective construction and $2000 for construction during four business days beyond the ten days covered by the performance bond. Litigation costs also were awarded to the Gilberts. Finding the damages award unsatisfactory, the Gilberts have appealed.

The Gilberts contend that the city and its contractor breached three separate contracts. The first was a contract between the city and the Gilberts, part oral and part written, which allegedly arose from state-

ments made by Graves and city officials, and from letters and memoranda delivered to the Gilberts by the city (City-Gilbert contract). The second was a written project contract between the city and TRC with benefits running to the Gilberts as third-party beneficiaries (TRC–City contract). The third contract was a written agreement between TRC and the Gilberts permitting construction during business hours (TRC–Gilbert contract).

The district court found that Graves was not an agent of the city, that in any case the Gilberts did not rely on any oral promises, and that any such statements were of a general nature and did not rise to the level of contractual promises. Therefore, the court denied recovery on the alleged oral part of the City-Gilbert contract. The trial court held the city was liable only on its written promises, specifically its promise to limit its contractor to a nine-day period of non-business hours on the site. The court found in favor of the Gilberts on their TRC–City and TRC–Gilbert contract theories. We address each of the Gilberts' contract theories in turn.

## I

### A. The City—Gilbert Contract

We must first determine the particulars of any contract existing between the city and the Gilberts. The Gilberts contend that Graves, Mayor McCluskey, and other agents of the city, guaranteed that the property would be restored to "as good or better" condition after laying the sewer line. They argue that the easement was granted in reliance upon or as consideration for performance of this promise. The Gilberts also contend that a written report prepared by the city engineer, which accompanied a letter from the mayor's administrative assistant, included promises to limit the construction period and hours, and to replace natural gas lines, fences and pavement.

Uncontradicted evidence indicates that the construction disturbed a layer of "hardpan," a highly compacted bed of soil located below the surface. The parties' experts agreed that such a layer can be created only by geologic processes and cannot be recreated by man. The Gilberts assert that the replacement fill is not as suitable for present or contemplated uses of the site as were the natural soils.

The district court found that Graves was a volunteer, not an agent of the city, and thus the city would not be bound by any statement or guarantee made by Graves. The court rejected a promissory estoppel theory urged by the Gilberts, finding no reliance on Graves' statements by the Gilberts. In addition, the court found that any "as good as" statements by the mayor or by others were of a general nature and were not contractual commitments. The court therefore limited liability under the City-Gilbert contract to damages arising from those promises made by city officials and reduced to writing.

### i. Authority of Graves

The Gilberts contend the court erred in concluding that Graves was a volunteer, rather than an agent of the city. We believe this issue is subsumed into the question next to be addressed. That is, whether the Gilberts' contract with the city included oral promises made either by Graves or by city officials, or whether that contract was expressed solely by written documents. If, as we do conclude, the writings—rather than oral promises—express the terms of the contract, then it is immaterial whether Graves was an agent of the city.

### ii. Oral statements by Graves and by city officials

The mayor and other city officials were clearly agents of the city possessing actual authority to enter into contracts. But proving the authority of an agent does not by itself establish the existence of a contract. Formation of the contract must also be proved.

There must be a meeting of the minds of the parties for a contract to be formed. *Pierson v. Sewell,* 97 Idaho 38,

539 P.2d 590 (1975). Whether there was a meeting of the minds as to the essential terms of the contract is a determination for the trier of fact. *Rasmussen v. Martin*, 104 Idaho 401, 659 P.2d 155 (Ct.App.1983). To be enforceable, a contract must embody a distinct understanding of the parties. *Dursteler v. Dursteler*, 108 Idaho 230, 697 P.2d 1244 (Ct.App.1985). The city contended, and the district court found, that the city officials' oral statements, and implicitly those of Graves, were not of the kind to constitute contractual promises, but instead were intended merely as encouragement. The court found the written promises of the city to be the specific provisions intended to address the Gilberts' concerns.

█ Prior to granting the easement the Gilberts contacted various city officials to obtain additional details concerning the project. The city responded through an administrative assistant's letter and a city engineer's report. The administrative assistant's letter informed Mr. Gilbert:

[T]he City of Caldwell will agree to the following considerations:

1. The part of the construction involving excavation, pipelaying, backfilling and paving shall be done during off-business hours. Access will be provided to all businesses during business hours. The period of construction will be limited to 9 calendar days and the construction will also include the replacement of the pavement according to specifications with a one-year warranty. No sealcoat is anticipated.

2. The contractor shall cooperate with the Gas Company to remove and replace the gasline shown on Sheet 13 of the plans within the above-defined 9 calendar day period such that all below-ground surface work shall be done before paving.

3. The contractor will be required to remove and replace all fences in like kind.

4. The City will provide a forklift and operator to relocate inventory, if required.

5. A 6–inch stubout will be left in manholes No. 1642 and 1643. A 6–inch stubout will also be left in the line at a point 10 feet west of the existing building (Gilbert's Auto Body).

The engineer's report included additional details and described structure prohibitions imposed by the easement, access provisions, applicability of relocation assistance, surfacing specifications, pavement base materials and other paving standards. Terms specifically limiting construction to non-business hours and to a nine-day period on the Gilberts' property were added to the city's contract with TRC. The city also referred the Gilberts to the TRC–City contract specifications regarding pavement replacement and fence removal and replacement. Only then, three months after Graves first contacted them, did the Gilberts grant the easement.

In the district court's opinion, the earlier "as good as" oral statements were intended merely as indications of a hope or expectation and not as contractual commitments. The district court found that the promises which were reduced to writing constituted the only consideration bestowed by the city in any City-Gilbert contract. The court implicitly found that the Gilberts' failed to carry their burden of proving an *oral* agreement between the city and the Gilberts to specifically restore the site to "as good or better" condition. This finding is not contrary to the evidence in the record.

*iii. Reliance on oral statements*

In the alternative, the Gilberts argue that the city is estopped from denying such promises. The Gilberts' contend they relied to their detriment upon the "as good as" promises. They contend they relied upon the representation by city officials that their concerns would be taken care of, and so did not examine the details of the TRC–City contract. The district court found no reliance on "as good as" promises.

█ The doctrine of promissory estoppel requires reliance upon a specific promise. 1 RESTATEMENT (SECOND) OF

CONTRACTS § 98 (1979) (hereinafter SECOND RESTATEMENT). A party seeking to avail itself of the doctrine of promissory estoppel must show that:

(1) the detriment suffered in reliance was substantial in an economic sense; (2) substantial loss to the promisee acting in reliance was or should have been foreseeable by the promisor; and (3) the promisee must have acted reasonably in justifiable reliance on the promise as made.

*Mohr v. Shultz,* 86 Idaho 531, 540, 388 P.2d 1002, 1008 (1964).

■ The district court evidently did not accept Bill Gilbert's testimony that the easement was granted in reliance on the alleged "as good as" promises. Instead, the court focused upon the more specific provisions of the written documents and the TRC–City contract as the more likely basis for the grant of the easement. The district court had the opportunity to observe the witnesses and to judge their credibility. The court's determination that the easement was granted in exchange for specific written promises, rather than in reliance on general oral promises, is supported by the evidence. We affirm the district court's conclusion that any City-Gilbert contract was limited to the terms of the written memorandum of the city engineer and the administrative assistant's letter.

### B. The TRC—City Contract

We turn next to the contract between the city and TRC. The evidence clearly established that certain terms were included in the TRC–City contract to protect the Gilberts. The Gilberts' right to claim this protection as a third-party beneficiary has not been contested. This contract provided that work on the Gilberts' property would only be conducted during non-business hours and would be completed in nine days. Of course, the contract also included terms applicable to the entire project. Of special interest in this case, it required compaction of the backfill material to 95% of a laboratory maximum in paved areas, such as the Gilberts' parking lot, and to 85% of maximum in other areas, such as the Gilberts' storage area. Apparently these compaction standards were not called to the Gilberts' attention prior to the easement being granted.

Experts for both sides testified that their respective tests of the site indicated that the fill was not compacted to the specified densities. These tests indicated that throughout the length of the trench the soil compaction fell from three to twelve percent below the density specifications in the contract. Only near the surface did the density approach the required standard. The parties disagree regarding the significance of these deviations.

The Gilberts' evidence indicated that the variance from the specifications resulted from the contractor's use of water-jet compaction techniques instead of a mechanical compaction process as called for in the contract. They presented expert testimony and documentary evidence indicating that some settling had occurred and that more—up to a maximum of eight inches—was inevitable. The defendants' expert also inspected the site. He testified that the limited settling of one or two inches, thus far, indicated that any future settling would be minimal.

■ The Gilberts ask that we find error in the trial judge's failure to accept the conclusions of their allegedly "better-qualified" expert. Whether soil compaction is defective and whether such defects have or will result in injury to the plaintiff are primarily questions of fact. *Cf. City of Wahpeton v. Drake-Henne, Inc.,* 228 N.W.2d 324 (N.D.1975) (evidence found to support damage award). The weight of expert testimony is uniquely a matter for determination by the fact-finder. *Rueth v. State,* 103 Idaho 74, 644 P.2d 1333 (1982). The opinion of an expert is not binding on the trier of fact and may be rejected, provided the trier of fact does not act arbitrarily. *Id.* The defendants' expert opined that any additional settling would be minimal. The trial court found the defendants' expert more credible. We decline to usurp the trial court's function in that regard.

### i. Measure of damages

Nonetheless, the district court did find that failure to meet the specified densities was a breach of the contract and that an injury to the Gilberts had resulted. The court found that some improvements near the surface were necessary to correct surface softness problems resulting from the defective performance. Concluding that recompaction of the entire volume of the trench was unnecessary to make the plaintiff whole, the court awarded $4989 as the cost of eliminating surface softness in the unpaved area. This remedy and its cost were derived from the defendants' evidence.

The Gilberts argue that, upon finding defective construction, the only remedy available to the court was to award the cost of correcting the defect by recompacting the entirety of the trench, or at least the upper five to nine feet if no buildings were to be constructed on the site. The Gilberts' counsel apparently assumed that the cost of the defendants' correction method, which would not result in compliance with the specifications, was a suitable measure of damages only if the defendants proved the Gilberts' correction method to be an "economic waste." Therefore, in rebuttal, the Gilberts offered evidence of the effect on the property's value. The defendants objected. They argued that this evidence related to a new issue and was improper on rebuttal. Defendants' counsel contended that they were not relying upon any "economic waste" in full restoration as a basis for resorting to an alternative measure of damages. The court accepted this proposition and sustained the objection. The Gilberts did not otherwise attempt to rebut the sufficiency of TRC's repair method. All parties agree that TRC's compaction method will *not* result in strict compliance with the compaction standards. The district court made no specific finding regarding economic waste.

The Gilberts do not claim error in the trial court's refusal to admit this evidence. Instead they rely upon 1 RESTATEMENT (FIRST) OF CONTRACTS § 346 (1932) (hereinafter FIRST RESTATEMENT) and an alleged "waiver" to establish an error by the district court in resorting to this measure of damages.

Section 346 reads in part:

Damages for Breach of a Construction Contract.

"(1) For a breach by one who has contracted to construct a specified product, the other party can get judgment for compensatory damages for all unavoidable harm that the builder had reason to foresee when the contract was made, ... determined as follows:

(a) For defective or unfinished construction he can get judgment for either

(i) the reasonable *cost of* construction and *completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste;* or

(ii) the difference between the *value* that the product contracted for would have had and the value of the performance that has been received by the plaintiff, *if construction and completion in accordance with the contract would involve unreasonable economic waste.* [Emphasis added.]

FIRST RESTATEMENT § 346.

In similar cases, our Supreme Court has cited Section 346 of the FIRST RESTATEMENT with approval. *E.g., Jensen v. Bledsoe,* 100 Idaho 84, 593 P.2d 988 (1979); *Hunt Bros. Constr., Inc. v. Wolcott,* 99 Idaho 241, 580 P.2d 418 (1978); *Hafer v. Horn,* 95 Idaho 621, 515 P.2d 1013 (1973).

TRC and the city contend that the district court *did* select a cost of completion or repair as the measure of damages. Their expert testified that replacing and recompacting the top eighteen inches of the unpaved area would yield a base strong enough to bear most traffic loads. The defendants introduced evidence of the cost of this repair method. We agree that the trial court did not resort to a difference-in-value measure. However, neither did the court apply the cost of completion *in accordance with the contract.*

Ordinarily, where a contract calls for achieving specific standards, strict compliance with those standards is required. A contractor is required to perform in accordance with plans and specifications. *Cf. Puget Sound Nat. Bank v. C.B. Lauch Constr. Co.*, 73 Idaho 68, 245 P.2d 800 (1952) (compliance with plans held to release contractor from fitness warranty). Substantial performance is performance which despite deviation or omission provides the important and essential benefits of the contract to the promisee. ID.J.I. 609; *see also Nelson v. Hazel*, 89 Idaho 480, 406 P.2d 138 (1965). Substantial performance will permit a contractor to recover on a contract, but it does not bar recovery by the promisee or a set-off for failure to strictly comply with the contract. *See Mackey v. Eva*, 80 Idaho 260, 328 P.2d 66 (1958). "It must be remembered that substantial performance is not full performance and that the party who relies on this doctrine has breached his contract. Consequently, he is liable in damages to the aggrieved party." [Footnote omitted.] J. CALAMARI AND J. PERILLO, THE LAW OF CONTRACTS (2d ed.) § 11–22 (1977).

Here, the contract provided that compaction was to be tested in a certain manner. The measure of costs to correct defects would ordinarily be the cost of bringing the project or structure into compliance with those standards. The trial court awarded damages based upon the cost of the defendants' alternate method of repair, finding it would achieve the "ultimate goal intended to be achieved by the plans and specifications." However, the court did not indicate whether it found this goal to be providing a site suitable for only present uses, suitable for present *and* contemplated future uses of the site, or "as good as" before construction. The Gilberts argue that the court could not resort to this measure of damages without finding that a repair resulting in compliance with specification would be an economic waste.

TRC argues that § 348 of the RESTATEMENT (SECOND) OF CONTRACTS (1979) (hereinafter SECOND RESTATEMENT) is the modern formulation of damages in defective or incomplete construction cases and that it would permit this alternative measure. Under § 347 of the SECOND RESTATEMENT the loss in value to the injured party is the ordinary measure of damages for breach. Neither party attempted to prove the lost value. Where lost value is not proven, damages may be measured by the "reasonable cost of completion or of remedying the defects if that cost is not clearly disproportionate to the probable loss in value to [the injured party]." SECOND RESTATEMENT § 348(2)(b).

Sometimes, however, such a large part of the cost to remedy the defects consists of the cost to undo what has been improperly done that the cost to remedy the defects will be clearly disproportionate to the probable loss in value to the injured party. Damages based on the cost to remedy the defects would then give the injured party a recovery greatly in excess of the loss in value to him and result in a substantial windfall. Such an award will not be made. It is sometimes said that the award would involve "economic waste," but this is a misleading expression since an injured party will not, even if awarded an excessive amount of damages, usually pay to have the defects remedied if to do so will cost him more than the resulting increase in value to him. If an award based on the cost to remedy the defects would clearly be excessive and the injured party does not prove the actual loss in value to him, damages will be based instead on the difference between the market price that the property would have had without the defects and the market price of the property with the defects. This diminution in market price is the least possible loss in value to the injured party, since he could always sell the property on the market even if it had no special value to him. SECOND RESTATEMENT § 348 comment c (1979).

Thus, in simplified form, under the FIRST RESTATEMENT the appropriate measure of damages is the cost of repair,

*unless such would be an economic waste,* in which case resort may be had to the value of the product contracted for less the value of the product actually constructed. Under the SECOND RESTATEMENT the ordinary measure is the loss in value; but if this loss is not proven (as in this case), the court should resort to the cost of completion or repairs *unless such would be disproportionate to the "probable" loss in value.*

It could be argued that the cost of a satisfactory, less costly repair method would approximate any lost value. However, when the Gilberts attempted to rebut any claim of economic waste the city's counsel objected and stated that neither the city nor TRC was relying on economic waste to invoke a diminution-in-value measure of damages. As noted, the objection was sustained. Clearly, the court did not resort to a FIRST RESTATEMENT § 346, lost-value measure.

Thus, we are asked to decide whether, absent an explicit finding of economic waste or disproportionality, a trial court may select the cost of an alternative method of repair, which would produce a result not strictly complying with the contract. "In an action for breach of contract, only such damages will be allowed as fairly compensate the injured party for his loss." *Nelson v. Hazel,* 91 Idaho 850, 851, 433 P.2d 120, 121 (1967). For breach of contract the law of damages seeks to place the aggrieved party in the same economic position he would have had if the contract had been performed. CALAMARI AND PERILLO, *supra,* § 14-4. Clearly, the cost of an alternative method of repair resulting in a comparable result may be appropriate where strict conformance with the contract would invite unreasonable economic waste. *D. Federico Co. v. New Bedford Redevelopment Authority,* 723 F.2d 122 (1st Cir. 1983).

Various measures of damages have been applied where a construction contract breach results in a defective product. *See generally,* Annotation, *Damages—Breach of Construction Contract,* 41 A.L.R.4th 131 (1985); D. DOBBS, HANDBOOK ON THE LAW OF REMEDIES § 1221 (1973); Farnsworth, *Legal Remedies For A Breach Of Contract,* 70 Colum.L.Rev. 1145 (1970).

The aim in assessing damages for deficiencies in performance should be to put the injured party in substantially as good a position as performance *in accordance with the contract.* The law recognizes, however, that sometimes actual reconstruction in compliance with the plans and specifications of the contract may be possible only at a cost that would be imprudent and unreasonable. Restatement of Contracts § 46, comment b at 574 (1932); A Corbin, *Contracts* § 1089, at 486–87 (1964). In such cases, the court should consider alternative measures of recoupment which will substantially compensate the injured party for the deficiency in a less economically wasteful manner. [Emphasis added.]

*Alaska State Housing Authority v. Walsh & Co., Inc.,* 625 P.2d 831, 837 (Alaska 1980). "The crux of the determination of which measure of damages to apply is therefore the proportionality of the cost to the corresponding benefits." *Eastlake Const. Co., Inc. v. Hess,* 102 Wash.2d 30, 686 P.2d 465, 473 (1984).

■■■ Ordinarily the correct measure in a contract claim would be the expectation interest, in this case being the cost of repair to comply with the specifications. "There is no general license to install whatever, in the builder's judgment, may be regarded as 'just as good.'" *Jacobs & Youngs v. Kent,* 230 N.Y. 239, 129 N.E. 889, 891 (1921). "The courts never say that one who makes a contract fills the measure of his duty by less than full performance." *Id.* 129 N.E. at 890. Therefore, ordinarily the cost-of-repair measure of damages should reflect a method of repair that would result in strict or full compliance with the terms of the contract.

■■■ Although a less costly alternative may be appropriate in some cases, we are convinced it should not be the measure of damages unless it has been shown that

the ordinary measure would be disproportionate to the loss in value or to the benefits of full repair, i.e. economically wasteful or result in a windfall to the injured party. *See* FIRST RESTATEMENT § 346; SECOND RESTATEMENT § 348(2). A finding permitting an alternate measure of damages should be specifically stated. *See* I.R.C.P. 52(a). A lack of findings may be disregarded by the appellate court only if the record is clear and yields an obvious answer to the relevant factual question. *See Donndelinger v. Donndelinger,* 107 Idaho 431, 690 P.2d 366 (Ct.App.1984). We do not find this record to clearly yield a finding of economic waste or disproportionately. Thus we remand to the trial court for reconsideration in light of this opinion. The trial court may take additional argument and evidence as deemed necessary to determine the appropriate measure of damages.

The Gilberts also contend that this repair method will not correct violations of federal natural gas line compaction standards. Although the presence of the gas line was noted at trial, whether these standards were applicable and violated was not an issue. To the extent that this matter is relevant to the cost-benefit proportion of Gilberts' repair method, the trial court in its discretion may permit additional evidence on this factor.

Finally, the Gilberts suggest that a lesser damages measure could not be applied because the breach was willful and intentional. A willful breach may bar recovery by a substantially-performing contractor. *See generally* 13 AM.JUR.2d *Building and Construction Contracts* § 42 (1964); Annotation, *Damages—Breach of Construction Contracts,* 41 A.L.R.4th 131, § 32 (1985). Here, however, the contractor is not seeking to recover. Thus this rule is not applicable.

#### ii. Additional damages

The Gilberts assert other inadequacies in the damages. In particular, they point to the trial court's award of only $166 for repairing eroded new pavement along the drainage ditch, and to no award for the failure of the contractor to seal the new and old pavement joint or for the cost of soil compaction testing.

Whether the eroded pavement was in an area not originally paved, and thus not required to be paved, was a matter of controversy. The district judge awarded damages on the basis of refilling, but not repaving, this area. Apparently the Gilberts did not satisfactorily prove a duty to repave this portion of the property. This finding is not clearly erroneous and will not be disturbed.

The court did not award any damages for the cost of testing the soil compaction. The compaction tests were conducted by the Gilberts in preparation for trial. An award of "discretionary costs" such as these are committed to the sound discretion of the trial court. *See* I.R.C.P. 54(d)(1)(D). In reviewing the record we find that the Gilberts claimed this expense in their complaint, but did not renew it in their memorandum of costs. Apparently these expenses were incurred in anticipation of litigation. The court did not address this claim, either in its findings of fact or its order regarding costs. We are unable to determine why these alleged consequential damages or costs were denied. On remand, the court is directed to enter findings and conclusions regarding this claim.

The Gilberts also assert that TRC failed to seal the joint between the new and old pavement, thus permitting moisture to enter. The district court did not address this claim. It should be considered on remand.

#### iii. Liability

■ The Gilberts contend that the city, as well as TRC, should have been held liable for defective performance. Whether the promisee may be held liable to a third-party beneficiary turns upon the beneficiary's status. A donee beneficiary, of course, has no rights against the promisee, except where the promisee has received consideration to discharge the promisor. J. CALAMARI AND J. PERILLO, THE LAW OF CONTRACTS § 17–10 (2d. ed. 1977).

A creditor beneficiary on the other hand, may also sue the promisee upon the original obligation, unless it is extinguished by an express novation. *Id.* As discussed above, the district judge found the underlying antecedent duty of the city to restore Gilberts' property to be limited to those written promises contained in reports and letters delivered to the Gilberts. These writings did not address the backfill standards. Thus the trial court did not err in concluding that only TRC, as promisor, was contractually liable for the defective backfill.

The district court also found that the Gilberts failed to prove any inadequacy in the specifications. This finding is not contrary to the record. The parties' experts seemed to agree that the plans and specifications were adequate for most purposes. This alternative theory of liability was not a substantial subject of litigation. We find no error in the district court's conclusion that the Gilberts failed to carry their burden of proof on this point.

### C. The TRC—Gilbert Contract

When TRC decided that construction during non-business hours was impractical, TRC contracted directly with the Gilberts to permit construction during business hours. All parties concede that the "non-business hours" provision of the TRC–City contract could be waived by the Gilberts. The TRC–Gilbert agreement provided for TRC to post a $5000 bond with Bill Gilbert, to be distributed to Gilbert's two tenants at the rate of $250 each per day of construction on the site. Any remaining funds were to be returned to TRC. Unfortunately, TRC required more than ten days to complete the construction on the Gilbert property. The trial judge found that construction on the site during business hours continued for fourteen days and thus an additional $2000 was due the Gilberts.

The Gilberts argue that the record does not support a finding of only fourteen days of business obstruction. They contend that, at minimum, the construction continued for sixteen business days. The record shows that trenching on the Gilberts' property began on Thursday, October 22. The TRC–Gilbert contract expressly began to run on Monday, October 26. Paving was completed on Thursday, November 12, eighteen calendar days later. Arguably, this contract waived any claim for damages before October 26. Bill Gilbert testified that the businesses on his property were open on Saturdays. This evidence was not contradicted. Although the contract did not define business days, apparently the trial judge counted only Monday through Friday. The Gilberts argue that Saturdays should have been included. On its face the agreement was to permit construction "during business hours" with compensation at the rate of $500 per day "until completion of said project." From our review of the record we are unable to ascertain a basis for the exclusion of Saturdays. We therefore find it necessary to remand the case for clarification or amendment of the trial court's findings and judgment regarding the number of days to be compensated under the TRC–Gilbert contract.

The Gilberts also seek compensation for breach of the nine-day limit in the TRC–City contract. The trial court did not specifically address this claim in its findings and conclusions. This clause, as well as the non-business hours provision, may have been superceded or waived by the TRC–Gilbert contract. In any case the later arrangement could be found to provide the appropriate measure of damages for business obstruction. As this action is being remanded for clarification of the "non-business hours" claim, we also direct the trial court to determine whether the Gilberts are entitled to any damages for breach of the nine-day limit.

### II

### *View as "Evidence"*

 With the consent of the parties, the trial judge conducted a view of the site in question. Later, in deciding this case, the district judge at one point in his findings characterized this view as "evidence." At other points he refers to the evidence

*and* to his observation of the site. The Gilberts contend that the court erred in characterizing this view as "evidence." It is well settled that a trial court, sitting without a jury, has discretion to view a site in order to evaluate and apply the evidence submitted. *Lobdell v. State*, 89 Idaho 559, 407 P.2d 135 (1965). A view of the premises may not supply a want of evidence and is not of itself evidence upon which a verdict may be based. *Tyson Creek R.R. v. Empire Mill Co.*, 31 Idaho 580, 174 Pac. 1004 (1918). Generally, a view is not characterized as evidence because, unlike real, testimonial and documentary evidence, it cannot be included in the record. We note that this distinction has been subject to attack. *See* E. CLEARY, McCORMICK ON EVIDENCE § 216 (3rd Ed.1984). The defendants ask us to adopt the approach that a "view" may constitute evidence. However, we find it unnecessary to make that determination. Even if the trial court erroneously considered its view of the premises as "evidence," if we disregard that "evidence" there otherwise remains substantial and competent evidence to support the trial court's findings. We conclude that the court's misstatement concerning the view as evidence was harmless error, not affecting the substantial rights of the parties. I.R.C.P. 61.

### III

### Costs

#### A. Rule 68 Offers

The trial court awarded costs to the Gilberts as prevailing parties. On cross appeal, TRC contends that a portion of this award is barred by I.R.C.P. 68. This rule provides that "[i]f the judgment, including attorney fees and costs, finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs, as allowed under Rule 54(d)(1), incurred after the making of the offer." To be effective, an offer must be made more than ten days "before the trial begins." I.R.C.P. 68. On November 30, 1984, TRC and the City offered settlements of $7500 and $2500, respectively. Apparently both of these offers were delivered by the city's counsel to the Gilberts. The offers were not expressly a "joint offer." It appears the Gilberts were free to accept or reject each offer independently. They chose to reject both.

Trial was scheduled for December 10, but on December 7 the parties agreed to "continue" the trial to December 12. Also, on December 7, the trial court found the tendered offers to be untimely, concluding that the last minute delay of commencement of trial should not provide an extension of the period for Rule 68 offers. The court grounded its conclusion on "fundamental fairness." As noted, the Gilberts ultimately were awarded $6989, plus I.R.C.P. 54 costs of $874 through November 30. TRC was held liable, either individually or jointly, for the entire amount.

■ Initially, we examine the trial court's reason for denying application of Rule 68. With regard to cost recovery our rule is identical to the federal rule. This rule is designed to encourage settlement and to avoid the expense and time of unnecessary trials. *Cf.* C. WRIGHT & A. MILLER, 12 FEDERAL PRACTICE AND PROCEDURE § 3001 (1973) (on federal rule). The question of when the trial "begins" for purposes of the federal rule was examined in *Greenwood v. Stevenson*, 88 F.R.D. 225 (D.R.I.1980). In *Greenwood*, a jury was selected and impanelled on April 2, 1980, but, because of the exigencies of pending criminal cases, a "trial date" of June 1 was anticipated. The defendants' offers of settlement were made on May 21, 1980. The plaintiff then sought to avoid the application of F.R.Civ.P. 68, arguing the defendants' offers were not timely. The court disagreed. The court reasoned that the settlement-encouraging purpose of the rule would best be served by selecting the last possible point in time for cutting off Rule 68 offers. The court held that the trial "begins" when the trial judge calls the proceedings to order and actually commences to hear the case, and *not* when the jury was selected previous to that time. Here, the initial trial date was "continued" at the same time that the timeliness motion

was decided. But the trial did not begin until twelve days after the offer was made. Applying our rule literally, and, in accord with *Greenwood,* we hold that the November 30 offers were timely.

■ However, as the Gilberts point out, TRC was adjudged liable for an amount slightly greater than its individual offer. TRC counters that, had the Gilberts accepted both offers, the Gilberts would have been in a more favorable position than was ultimately obtained. Thus, we are confronted next with whether—in cases involving multiple defendants—Idaho's Rule 68 should be read to compare (a) independent offers with a particular party's ultimate liability, or (b) collective offers with the total recovery.

Charles Wright and Arthur Miller suggest that one purpose of the federal rule is to protect the party making the offer. *See* 12 FEDERAL PRACTICE AND PROCEDURE § 3001 (1973). Rule 68, as formulated, compares "the judgment" and "the offer." Ordinarily a defendant should not be permitted to point to the offers of others for protection from prospective cost recovery. Therefore, we believe Rule 68 should be read to test the offer and recovery from each party independently.[1] Only if its own offer exceeded its individual liability can the particular defendant be said to have made a fair offer. We believe this interpretation will forward the rule's policy of encouraging fair and reasonable settlement offers by each party. Here, TRC was ultimately held liable for more than the $7500 it offered. Therefore, with respect to TRC, the Gilberts' position after trial was more favorable than if TRC's offer had been accepted.

### B. Prevailing Party

In the alternative, TRC contends that the Gilberts were not the 'prevailing party' for purposes of Rule 54(d)(1). TRC notes that the Gilberts originally sought over $160,-000 on various claims and only recovered slightly more than $7500. We are not persuaded.

■ The determination of who is the prevailing party is committed to the trial court's sound discretion. *Decker v. Homeguard Systems,* 105 Idaho 158, 666 P.2d 1169 (Ct.App.1983). When more than one party prevails—even in part—the trial court may determine which of them has prevailed for purposes of awarding costs. *McGill v. Lester,* 108 Idaho 561, 700 P.2d 964 (Ct.App.1985). Here certain claims sounding in tort were voluntarily dismissed by the Gilberts. They then prevailed at trial on a contract theory. The recovery was limited only because the trial court adopted an alternative measure of damage. TRC cites cases of limited or nominal recovery for the proposition that a recovering party is not always the prevailing party. *E.g., Yellow Pine Water User's Ass'n v. Imel,* 105 Idaho 349, 670 P.2d 54 (1983). These cases do not suggest to us that the trial court in this case abused its discretion in deeming the Gilberts the prevailing party with respect to TRC. On remand, the Gilberts' recovery may be increased, but will not be reduced. Therefore, the award of costs is affirmed.

### IV

### Conclusion

In summary, we affirm the district court's finding that there was no binding oral agreement by statements of Graves or city officials to return the property to "as good or better" condition. The Gilberts' contract with the city was properly limited to the writings. The court's denial of damages for eroded pavement is also affirmed. The district court's award to the Gilberts of costs subsequent to offers of settlement is affirmed. The court's characterization of the view as evidence is deemed harmless error. The court's conclusions regarding

1. Our result would be different had TRC and the city expressly made a joint, unapportioned offer of settlement, which could only be accepted or rejected in total by the Gilberts. In such a case, the collective offers may properly be compared to the total recovery. *E.g. Johnston v. Penrod Drilling Co.,* 803 F.2d 867 (5th Cir.1986) (applying federal rule).

the liability of each defendant under the respective contracts are affirmed.

Our remand of the case relates to the amount of damages only. With respect to the measure of damages for breach by TRC of its contract with the city, we hold that the court erred by applying the defendants' measure of damages without a finding of economic waste or disproportionate cost. We remand for additional findings and possible modification of the award consistent with this opinion. On remand the court is also directed to address the Gilberts' claims for cost-of-testing and for sealing the pavement joint. We remand for findings and possible modification of the judgment with respect to the amount of TRC's liability pursuant to the TRC–Gilbert contract to compensate the Gilberts for construction during business hours. The court is also directed to clarify its findings regarding the nine-day period limitation. The district court may take additional evidence as directed and as deemed necessary. Finally, to the extent that any award of damages on remand embodies amounts previously awarded, the court should allow interest on those amounts at the statutory rate applicable to judgments, from the date of the original judgment. Any additional damages awarded as a result of this remand should bear interest from the date of the new judgment. Because we find each party to prevail in part on appeal, we decline to award fees or costs on appeal.

BURNETT and SWANSTROM, JJ., concur.